# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

## 2022 ND 150

| | |
|---|---|
| Northwest Landowners Association, | Plaintiff and Appellee |
| v. | |
| State of North Dakota, North Dakota Industrial Commission, Hon. Douglas Burgum in his official capacity as Governor of the State of North Dakota, and Hon. Drew H. Wrigley in his official capacity as Attorney General of North Dakota, | Defendants and Appellants |
| and | |
| Board of University and School Lands of the State of North Dakota, | Defendant |
| and | |
| Continental Resources, Inc., | Intervenor-Defendant and Appellant |

## No. 20210148

Appeal from the District Court of Bottineau County, Northeast Judicial District, the Honorable Anthony S. Benson, Judge.

AFFIRMED IN PART AND REVERSED IN PART.

Opinion of the Court by Tufte, Justice.

Derrick L. Braaten (argued) and Todd A. Sattler (on brief), Bismarck, N.D., for plaintiff and appellee.

Matthew A. Sagsveen, Solicitor General (argued), and Steven B. Nelson, Office of Attorney General, Bismarck, N.D., for defendants and appellants.

L. Poe Leggette (argued) and Alexander K. Obrecht (appeared), Denver, Colorado, for intervenor-defendant and appellant Continental Resources, Inc.

Lawrence Bender, Bismarck, N.D., for amicus curiae North Dakota Petroleum Council.

**Tufte, Justice.**

[¶1]   Northwest Landowners Association commenced this action, challenging the constitutionality of Senate Bill 2344, which relates to subsurface pore space. The district court granted the Association's cross-motion for summary judgment, concluding S.B. 2344 is unconstitutional under the state and federal takings clauses. The State and Continental Resources appeal from the district court's summary judgment order and amended judgment. On appeal, the State argues that S.B. 2344 does not violate the state or federal takings clauses and does not constitute an unconstitutional gift and that the district court misapplied N.D.R.Civ.P. 56 by failing to consider evidence submitted by the State. Continental Resources, on the other hand, argues the court erred in analyzing the Association's facial challenge, in determining pore space has value as a matter of law, and in denying Rule 56(f) discovery. The State also appeals from the court's order granting attorney's fees and expenses, arguing the court abused its discretion in awarding the Association attorney's fees. We affirm in part and reverse in part the amended judgment, and we affirm the order granting attorney's fees and expenses.

I

[¶2]   In 2019, the Legislative Assembly enacted S.B. 2344, relating to pore space, which is defined as "a cavity or void, whether natural or artificially created, in a subsurface sedimentary stratum." N.D.C.C. §§ 47-31-02; 38-11.1-03(7). Senate Bill 2344 contained three sections that amended and reenacted three existing statutes (N.D.C.C. §§ 38-08-25, 38-11.1-01, 38-11.1-03) and a fourth section that created and enacted N.D.C.C. § 47-31-09.

[¶3]   Section 1 of S.B. 2344, amending N.D.C.C. § 38-08-25, designated the use of carbon dioxide for enhanced recovery of oil, gas, and other minerals as an additional acceptable recovery process. Section 1 also added three legislative declarations that certain activities relating to the use of carbon dioxide are in the public interest, along with a grant of rulemaking authority to the North Dakota Industrial Commission ("NDIC") to effectuate these purposes. Section

1 also added subsection 5, which allows an oil and gas operator to use subsurface pore space and denies the surface owner the right to exclude others or to demand compensation for this subsurface use. Section 38-08-25(5), N.D.C.C., states:

> Notwithstanding any other provision of law, a person conducting unit operations for enhanced oil recovery, utilization of carbon dioxide for enhanced recovery of oil, gas, and other minerals, disposal operations, or any other operation authorized by the commission under this chapter may utilize subsurface geologic formations in the state for such operations or any other permissible purpose under this chapter. Any other provision of law may not be construed to entitle the owner of a subsurface geologic formation to prohibit or demand payment for the use of the subsurface geologic formation for unit operations for enhanced oil recovery, utilization of carbon dioxide for enhanced recovery of oil, gas, and other minerals, disposal operations, or any other operation conducted under this chapter. As used in this section, "subsurface geologic formation" means any cavity or void, whether natural or artificially created, in a subsurface sedimentary stratum.

[¶4]   Section 2 of S.B. 2344, amending N.D.C.C. § 38-11.1-01, supplemented existing legislative findings emphasizing the importance of agriculture to the public welfare and recognized the importance of "preserving and facilitating exploration through the utilization of subsurface pore space in accordance with an approved unitization or similar agreement, an oil and gas lease, or as otherwise permitted by law." N.D.C.C. § 38-11.1-01(1). Section 2 also added an interpretive provision stating, "This chapter may not be construed to alter, amend, repeal, or modify the law concerning title to pore space under section 47-31-03." N.D.C.C. § 38-11.1-01(4).

[¶5]   Section 3 of S.B. 2344, amending N.D.C.C. § 38-11.1-03, adopted a new definition of "Land" that "excludes pore space." Chapter 38-11.1, also known as the Damage Compensation Act, requires the mineral developer to compensate the surface owner for "lost land value, lost use of and access to the surface owner's land, and lost value of improvements caused by drilling operations." N.D.C.C. § 38-11.1-04.

[¶6] Lastly, section 4 of S.B. 2344 enacted a new section barring tort claims for injection or migration of substances into pore space. Section 47-31-09(1), N.D.C.C., states:

> Injection or migration of substances into pore space for disposal operations, for secondary or tertiary oil recovery operations, or otherwise to facilitate production of oil, gas, or other minerals is not unlawful and, by itself, does not constitute trespass, nuisance, or other tort.

[¶7] The Association filed a complaint against the State, challenging the constitutionality of S.B. 2344 on its face. The Association argued S.B. 2344 constituted a taking because it "strips landowners of their right to possess and use the pore space within their lands and allows the State of North Dakota to directly redistribute that right to others without the consent of or compensation to the landowners." Continental Resources intervened and became an additional defendant to the suit. The State and Continental Resources collectively moved for judgment on the pleadings. The Association responded by filing a cross-motion for summary judgment.

[¶8] A status conference was held during which the State argued it needed further discovery before it could respond to the Association's summary judgment motion. The State filed a Rule 56(f), N.D.R.Civ.P., motion arguing further discovery was needed to establish the value of pore space. The court did not decide the State's Rule 56(f) motion before the deadline to respond to the Association's summary judgment motion. The State then filed its own cross-motion for summary judgment.

[¶9] The district court granted summary judgment in favor of the Association. In its order, the court denied the State's motion to conduct discovery, concluding pore space has value as a matter of law and further discovery was not necessary to decide the summary judgment motions. First, the court concluded that landowners have a property right in the underlying pore space and a right to compensation for use of their pore space. Second, the court rejected the Appellants' argument that S.B. 2344 could be constitutionally applied in some scenarios and for that reason is not facially invalid. Third, the district court concluded S.B. 2344 was enacted for the "constitutionally

impermissible purpose of economic development to benefit private parties." It concluded that S.B. 2344 constitutes a taking under both the federal and state constitutions because it takes landowners' property without compensation for the benefit of private parties while also barring the landowners from seeking tort remedies, including trespass. The court found S.B. 2344 "unconstitutional on its face" and declared the entire bill invalid. The court issued an injunction preventing enforcement of the law.

[¶10] After the district court granted its motion for summary judgment, the Association moved for attorney's fees under 42 U.S.C. §§ 1988 and 1983. The court awarded attorney's fees, concluding attorney's fees may be awarded under § 1988 even if the complaint does not expressly rely on § 1983 or § 1988.

II

[¶11] We first address Continental Resources' argument that the district court erred in analyzing a threshold question to the Association's facial challenge to S.B. 2344. Continental argues that because it can identify constitutional applications of S.B. 2344, the court erred in continuing on to analyze the Association's takings challenge.

[¶12] The Association's complaint sought a declaration that S.B. 2344 is unconstitutional and should be declared void, therefore making a facial challenge rather than an as-applied challenge. "A claim that a statute on its face violates the constitution is a claim that the Legislative Assembly exceeded a constitutional limitation in enacting it, and the practical result of a judgment declaring a statute unconstitutional is to treat it 'as if it never were enacted.'" *Sorum v. State*, 2020 ND 175, ¶ 21, 947 N.W.2d 382 (citing *Hoff v. Berg*, 1999 ND 115, ¶ 19, 595 N.W.2d 285). A facial challenge is a question of law and fully reviewable on appeal because a "violation that occurs at the time of enactment does not depend on any facts or circumstances arising later." *Sorum*, at ¶ 21.

[¶13] Continental Resources argues it has identified constitutional applications of S.B. 2344 which it contends defeat the facial challenge at the outset under the "no set of circumstances" standard we applied in *Larimore Pub. Sch. Dist. No. 44 v. Aamodt*, 2018 ND 71, ¶ 38, 908 N.W.2d 442 (citing

4

*United States v. Salerno*, 481 U.S. 739, 745 (1987)). Specifically, Continental Resources argues S.B. 2344 can be constitutionally applied to units, pre-2009 conveyances of pore space, and situations where there is a disposal contract in place. The district court considered these scenarios and rejected them, holding it "does not conclude a scenario has been shown which causes [the Association]'s facial challenge to fail the *Salerno* test."

[¶14] This facial challenge asserts a violation of the constitution by the Legislative Assembly when it enacted S.B. 2344. In *Aamodt*, we applied the *Salerno* "no set of circumstances" standard to a facial constitutional challenge. 2018 ND 71, ¶ 38. However, since *Salerno*, other courts have declined to apply that standard to facial challenges. *Utah Pub. Emps. Ass'n v. State*, 2006 UT 9, ¶¶ 20–25, 131 P.3d 208 (rejecting application of *Salerno* in a facial takings challenge and collecting supporting cases). The Supreme Court has also declined to apply *Salerno* in subsequent decisions considering facial challenges. *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself."). No consideration of circumstances is necessary to resolve a facial challenge because the claim is that upon enactment, the legislation has an immediate unconstitutional legal effect. In *Sorum*, we held that if legislation requires an unconstitutional act (a prohibited gift in that case), the statute does not avoid a facial challenge "merely because the statute includes constitutional applications along with potentially unconstitutional applications." 2020 ND 175, ¶¶ 22–24.

[¶15] Here, the Association claims the enactment of S.B. 2344 by itself completed a taking of constitutionally protected property rights without compensation. As presented, the constitutional claim does not depend on future action by a government official or consideration of various factual circumstances to which the legislation may be applied. To resolve the claim, we need only interpret the enacted language of S.B. 2344 and the relevant constitutional provisions to determine whether there is a conflict. We conclude that *Sorum* provides the correct framework for this facial challenge.

# III

## A

[¶16] We now turn to the Association's takings challenge. The Fifth Amendment guarantees that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V. "The takings clause of the Fifth Amendment is made applicable to the states through the Fourteenth Amendment." *Wild Rice River Estates, Inc. v. City of Fargo*, 2005 ND 193, ¶ 12, 705 N.W.2d 850. The North Dakota Constitution provides overlapping and broader protection against government interference with property rights: "Private property shall not be taken or damaged for public use without just compensation having been first made to, or paid into court for the owner." N.D. Const. art. I, § 16. It "was intended to secure to owners, not only the possession of property, but also those rights which render possession valuable." *Grand Forks-Traill Water Users, Inc. v. Hjelle*, 413 N.W.2d 344, 346 (N.D. 1987).

[¶17] When this Court interprets constitutional provisions, "we apply general principles of statutory construction." *State v. Strom*, 2019 ND 9, ¶ 6, 921 N.W.2d 660. We aim to give meaning to every word, phrase, and sentence in a statute. *Id.* Statutory provisions "are given their plain, ordinary, and commonly understood meaning, unless they are specifically defined or a contrary intention plainly appears." *Mosser v. Denbury Res., Inc.*, 2017 ND 169, ¶ 13, 898 N.W.2d 406. "Words and phrases are construed according to the context in which they are used and technical words defined by statute must be construed according to the appropriate definition." *Id.* Statutes are construed as a whole and are harmonized to give meaning to related provisions. *Id.* We construe statutes to give effect "to all of their provisions so no part of the statute is rendered inoperative or superfluous." *Id.*

[¶18] "Whether a statute is unconstitutional is a question of law, which is fully reviewable on appeal." *Teigen v. State*, 2008 ND 88, ¶ 7, 749 N.W.2d 505. Under N.D. Const. art. VI, § 4, we "shall not declare a legislative enactment unconstitutional unless at least four of the members of the court so decide."

# B

[¶19] To establish a violation under the Takings Clause, challengers must demonstrate they have a property interest that is constitutionally protected. *Phillips v. Wash. Legal Found.,* 524 U.S. 156, 164 (1998). "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Id.* Therefore, we must first look to state law to determine whether the surface owners have a property interest in subsurface pore space.

[¶20] The Association argues that S.B. 2344 strips surface owners of their rights to exclude others from pore space, demand compensation for its use, and bring actions in tort to secure these rights. We now examine the historical scope of a surface owner's rights to the underlying pore space. In 1979, the Legislature provided a statutory remedy for surface owners in enacting the Oil and Gas Production Damage Compensation Act. 1979 N.D. Sess. Laws ch. 396. The Act expressed that "[i]t is the purpose of this chapter to provide the maximum amount of constitutionally permissible protection to surface owners and other persons from the undesirable effects of development of minerals." N.D.C.C. § 38-11.1-02. In enacting chapter 38-11.1, "the legislature explicitly found that '[o]wners of the surface estate . . . should be justly compensated for the injury to their persons or property and interference with the use of their property occasioned by oil and gas development.'" *Mosser*, 2017 ND 169, ¶ 21 (quoting N.D.C.C. § 38-11.1-01(3)). Section 38-11.1-04 required "a mineral developer to pay a surface owner a sum of money equal to the amount of damages sustained by the surface owner 'for lost land value, lost use of and access to the surface owner's land, and lost value of improvements caused by drilling operations.'" *Id.* at ¶ 22. In 1983, the Legislative Assembly added the phrase "lost use of and access to the surface owner's land" to N.D.C.C. § 38-11.1-04. *Id.* Chapter 38-11.1 did not define "land." Later, in 2009, the Legislative Assembly enacted the pore space statute to provide a statutory definition of pore space and to confirm that title to pore space is vested in the surface owner. N.D.C.C. § 47-31-03, § 47-31-05; *see also Mosser*, at ¶ 16 ("The legislation codifying pore space policy was intended to confirm that surface

owners own the pore space under their surface estate."). In 2017, this Court addressed whether the use of the term "land" in § 38-11.1-04 authorizes surface owners to recover compensation for a mineral developer's use of their pore space for the disposal of saltwater generated as a result of drilling operations. *Mosser*, at ¶ 23. We held that "the term 'land' in N.D.C.C. § 38-11.1-04 encompasses 'pore space.'" *Id*. We concluded that "a surface owner may be entitled to compensation under N.D.C.C. § 38-11.1-04 for a mineral developer's use of the surface owner's subsurface pore space for disposal of saltwater." *Id*. at ¶ 24.

[¶21] Additionally, prior to the enactment of S.B. 2344, surface owners could sue for trespass for the use of their surface estate that was not "reasonably necessary" to develop the mineral estate. *See Mosser v. Denbury Res., Inc.*, 112 F. Supp. 3d 906, 918–19 (D.N.D. 2015). When mineral rights are severed from the surface, an implied easement is created whereby the mineral owner may use the surface estate for reasonably necessary operations to "explore, develop, and transport the minerals." *Hunt Oil Co. v. Kerbaugh*, 283 N.W.2d 131, 135–36 (N.D. 1979). For operations within a spacing unit or a unitized field, the implied easement is expanded to operations that are "reasonably necessary" for the production of minerals within the spacing unit or unitized field.[1] *Cont'l Res., Inc. v. Farrar Oil Co.*, 1997 ND 31, ¶¶ 17–18, 559 N.W.2d 841 (reasoning it was not a trespass to drill through appellant's subsurface formation because appellant's leasehold was within a force-pooled spacing unit); *Fisher v. Cont'l Res., Inc.*, 49 F. Supp. 3d 637, 646 (D.N.D. 2014) ("the Unit Operator[] has a general right to conduct salt water disposal operations within the Unit"). If the surface estate were being used for the benefit of mineral production from outside the spacing unit or unitized field, a surface owner could bring a trespass action because that would go beyond the rights of the implied easement. *Mosser*, 112 F. Supp. 3d at 918 ("The express or implied rights . . .

---

[1] Under N.D.C.C. § 38-08-07(1), the NDIC may unitize a field or pool a spacing unit which joins together various mineral interests in a specific reservoir to increase ultimate oil and gas recovery. With pooled spacing units or unitized fields, the implied easement is expanded such that the mineral owner can use any part of the surface estates pooled in the spacing unit or unitized field as reasonably necessary to produce minerals from beneath that unit or field.

do not authorize [the mineral owner] to dispose of salt water generated from outside the Unit.").

[¶22] Thus, North Dakota law has long established that surface owners have a property interest in pore space. "[T]he owner of a surface estate owns the underlying pore space." *Mosser,* 2017 ND 169, ¶ 17. It has been in our law since before statehood that an "owner of land in fee has the right to the surface and to everything permanently situated beneath or above it." *Id.* at ¶ 16. The 2009 enactment of chapter 47-31, N.D.C.C., simply "confirm[ed] that surface owners own the pore space under their surface estate." *Mosser*, at ¶ 16; *see also* N.D.C.C. § 47-31-02 (defining pore space); N.D.C.C. § 47-31-03 ("Title to pore space in all strata underlying the surface of lands and waters is vested in the owner of the overlying surface estate."). Therefore, we conclude that surface owners have demonstrated they have a constitutionally protected property interest in pore space that is recognized under state law.

C

[¶23] We now address the merits of the Association's takings challenge under the federal and state constitutions. We analyze the federal and state claims together because no party has argued the text or history of the state constitutional provision requires us to apply a different standard for per se takings. We have recognized two categories of regulations as per se takings. *Wild Rice River,* 2005 ND 193, ¶¶ 13, 16 (citing *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005)). The first category is "where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation." *Id*. at ¶ 13; *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982). Because physical takings "eviscerate[] the owner's right to exclude others from entering and using her property," compensation is required. *Wild Rice River*, at ¶ 13. The second category applies to regulations that completely deprive an owner of all economically beneficial use of her property. *Id*. at ¶ 18 (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)). "The complete elimination of a property's value is the determinative factor in this category because the total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation." *Id*. at ¶ 13. Outside of these two

categories, takings challenges are governed by the standards set forth in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978), in which taking claims turn on situation-specific factual inquiries. *Id.*

[¶24] The district court found S.B. 2344 to be a per se taking under the first category: a physical invasion. It found that S.B. 2344 "allows for physical intrusion of a land owner's property." Further, the Association argues that S.B. 2344 is a per se taking because it "authorizes a physical invasion" and therefore "should be decided under *Loretto*." We have cited *Loretto* favorably for its treatment of physical occupation takings when considering state law claims, *Sauvageau v. Bailey*, 2022 ND 86, ¶ 24, 973 N.W.2d 207, and the parties do not argue that our state constitution requires different analysis for physical occupations. Because the Association neither argues it is a per se taking under the second category nor directs us to use the standards set forth in *Penn Central*, we analyze the Association's physical occupation takings claims using the *Loretto* physical occupation framework.

[¶25] Government-authorized physical invasions of property constitute the "clearest sort of taking" and therefore are a per se taking. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021). "[A]n owner suffers a special kind of injury when a *stranger* directly invades and occupies the owner's property." *Loretto*, 458 U.S. at 436. A physical invasion "is qualitatively more severe than a regulation of the *use* of property . . . since the owner may have no control over the timing, extent, or nature of the invasion." *Id.* Further, regardless of whether the physical occupation is permanent or temporary, just compensation is required. *Cedar Point Nursery*, 141 S. Ct. at 2074. Even if the physical invasion has only minimal economic impact on the owner, compensation is required because when there is a physical occupation of property, it effectively destroys the owner's rights to possess, use, and dispose of the property. *Loretto*, 458 U.S. at 435–36; *Cass Co. Joint Water Res. Dist. v. Aaland*, 2021 ND 57, ¶¶ 13–14, 956 N.W.2d 395. Further, because government-authorized physical invasions take away the landowner's right to exclude—"one of the most treasured" rights of property ownership—they are a per se taking. *Cedar Point Nursery*, 141 S. Ct. at 2072, 2074; *Wild Rice River,* 2005 ND 193, ¶ 13 (stating a "permanent physical invasion" is a per se taking because "the owner's right

to exclude others from entering and using her property [is] perhaps the most fundamental of all property interests").

[¶26] Senate Bill 2344 constitutes a per se taking. It allows third-party oil and gas operators to physically invade a landowner's property by injecting substances into the landowner's pore space. As demonstrated in *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 34 (2012), physical invasion by water, even for a limited duration, results in a per se taking. Furthermore, because S.B. 2344 permits oil and gas operators to use pore space to temporarily or permanently store or dispose of gases and wastes, the bill authorizes an occupation of the landowners' property. Similar to the unconstitutional regulation in *Cedar Point Nursey*, S.B. 2344 grants oil and gas operators a right of access to the landowners' private property. Further, as in *Loretto*, 458 U.S. at 436, S.B. 2344 restricts landowners from having any control over the "timing, extent, or nature of the invasion." As amended, the statutes would allow anyone conducting operations under Chapter 38-08 to inject waste into a surface owner's pore space without the surface owner's consent. *See* N.D.C.C. § 47-31-09(1) (stating that "[i]njection . . . of substances into pore space . . . is not unlawful and, by itself, does not constitute trespass"). Allowing such usage takes away one of the most treasured property rights because it takes away landowners' right to exclude oil and gas operators from trespassing and disposing waste into their pore space.

[¶27] Surface owners have a right to compensation for the use of their pore space for disposal and storage operations. *Mosser*, 2017 ND 169, ¶ 24. Although an oil and gas operator has a right under the implied easement to dispose of waste water within the same unit or pool, the operator must compensate the surface owner for the disposal of waste. *Id.*; *see also Fisher*, 49 F. Supp. 3d at 646–47. By prohibiting the right to compensation for use of the surface owner's pore space and eliminating the right to exclude, S.B. 2344 removes all rights that make ownership of pore space valuable. Furthermore, although the use of pore space may not seriously interfere with a landowner's use of the rest of his land because the pore space is deep beneath the surface, *Loretto* held that compensation is required for physical invasions even if the owner suffers only a "minimal economic impact." 458 U.S. at 434–35. Therefore, because S.B. 2344

deprives surface owners from demanding compensation for physical occupation of their property, S.B. 2344 is an unconstitutional taking on its face in violation of the state and federal constitutions.

[¶28] However, because the implied easement authorizes the mineral owner to use the surface estate as "reasonably necessary" to find and develop minerals when the surface and mineral estates are severed, the State argues the dominant mineral estate principle saves S.B. 2344 from a constitutional challenge. The circumstances of this case are unlike the *Loretto* line of cases in that here a third party may already have a right to access and use a landowner's pore space. Because the dominant mineral estate principle grants specific usage rights to the mineral estate owner, an additional layer of analysis is required.

[¶29] To determine whether the dominant mineral estate principle saves S.B. 2344 from a takings violation, we first must determine whether S.B. 2344 applies only to unit operations. The district court concluded in the negative, stating, "While the language in N.D.C.C. § 38-08-25(5) does specifically address units, it continues with a comma, followed by the specific text 'or any other operation authorized by the commission *under this chapter*.'" We agree with this interpretation. First, the placement of the comma and the use of "or" indicates that the legislation applies to other operations authorized by the NDIC apart from unit operations. Second, operation of saltwater disposal wells is one of the operations authorized by the NDIC under Chapter 38-08, regardless of the source of the saltwater relative to the location of the well. Third, there is no language limiting the location of the "subsurface geologic formations." Instead of stating that a person conducting unit operations for disposal operations may utilize subsurface geological formations *within the unit*, the provision specifically provides that a "person conducting . . . disposal operations . . . may utilize subsurface geological formations *in the state*." N.D.C.C. § 38-08-25(5). This language plainly authorizes disposal of saltwater from outside the unit. Fourth, the State concedes that "a commercial saltwater disposal well could fall within the catchall 'or any other operation authorized by the Commission under this chapter [38-08],' and be permitted by the Commission outside of a designated unit." We conclude that the plain meaning

of S.B. 2344 authorizes subsurface disposal of waste generated within a spacing unit or unitized field and also disposal of waste generated outside the unit or field.

[¶30] Even when a severance of minerals has created an implied easement permitting use of the surface estate by the owner of the severed minerals, S.B. 2344 constitutes a taking. We begin by recognizing that the implied easement allows the mineral developer to conduct disposal operations within a pooled spacing unit or unitized field for saltwater produced from wells located within that particular unit or field. These disposal operations are "reasonably necessary" for the production of minerals within that unit or field. *Fisher*, 49 F. Supp. 3d at 646–47; *Hunt Oil Co.*, 283 N.W.2d at 135. However, if a disposal well is used to dispose of saltwater produced outside the unit or field, the disposal operations are not "reasonably necessary" for production of the relevant dominant estate—the minerals within that unit or field. *Mosser*, 112 F. Supp. 3d at 918 ("The express or implied rights . . . do not authorize [the mineral owner] to dispose of salt water generated from outside the Unit."); *see also Krenz v. XTO Energy, Inc.,* 2017 ND 19, ¶ 42, 890 N.W.2d 222 ("[A] lessee generally cannot, in the absence of contractual permission, use the surface of one lease to benefit mining operations on adjacent land."). Although disposal operations beyond the scope of the implied easement would be otherwise considered a trespass, S.B. 2344 bars landowners from bringing such a tort action. Senate Bill 2344 declares that such disposal operations "by [themselves], do[] not constitute trespass." Thus, the dominant mineral estate principle does not save S.B. 2344 from this takings claim.

D

[¶31] The State also argues that S.B. 2344 is not an unconstitutional taking because it is a proper exercise of its police power. The State argues the United States Supreme Court has recognized "exceptions to its tests for determining whether a government regulation constitutes a taking" and courts "must consider and evaluate state law to determine whether property owners have an expectation that their title is limited by state law." Relying primarily on *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1027 (1992), the State argues there are existing state law limitations on landowners' rights associated with

13

pore space, including the state's police power. According to the State, S.B. 2344 is not a taking, because the landowners took title to pore space with an expectation that their title is limited by the police power.

[¶32] The State's argument is misplaced because our cases make clear that the takings clause limits the state's exercise of its police power. "The police power is the power inherent in a government to enact laws, within constitutional limits, to promote the order, safety, health, morals, and general welfare of society." *State ex rel. City of Minot v. Gronna*, 79 N.D. 673, 699, 59 N.W.2d 514, 532 (1953) (cleaned up). Under the police power "the legislature may, *within constitutional limitations*, not only prohibit all things hurtful to the comfort, safety, and welfare of society, but prescribe regulations to promote the public health, morals, and safety, and add to the general public convenience, prosperity, and welfare." *State v. Cromwell*, 72 N.D. 565, 576, 9 N.W.2d 914 (1943) (emphasis added). When an action is determined to be within the broad scope of the state's police power, the court still must consider whether just compensation is due for a taking or damaging of property. *Wilson v. City of Fargo*, 141 N.W.2d 727, 731–32 (N.D. 1965) (just compensation required for damaging private property where city action was clearly within scope of its police power). Generally, "use or injury of private property under the police power is uncompensated in this State only where such power is exercised to meet sudden emergencies." *Irwin v. City of Minot*, 2015 ND 60, ¶ 8, 860 N.W.2d 849 (quoting *Wilson*, 141 N.W.2d at 728).

[¶33] Furthermore, the State's argument that landowners took title with the expectation that their pore space would be limited by state law applies only to regulatory takings under the *Lucas* line of cases, which is the second per se category. The Association challenged S.B. 2344 only as a *Loretto* physical invasion, which is the analysis under which the district court found a per se taking. As the Supreme Court explained, "*Lucas*, however, was about regulatory takings, not direct appropriations. Whatever *Lucas* had to say about reasonable expectations with regard to regulations, people still do not expect their property, real or personal, to be actually occupied or taken away." *Horne v. Dep't of Agric.*, 576 U.S. 350, 361 (2015). The Supreme Court's cases have "stressed the 'longstanding distinction' between government acquisitions of

property and regulations," and therefore "[i]t is 'inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a "regulatory taking," and vice versa.'" *Id*. Here, the takings claim is not premised on a regulation of what the surface owners may do with their property, but rather on the State's granting a broad authorization to third parties to physically occupy the surface owners' pore space. This is an exercise of the State's police power that is limited by the takings clause. Property owners necessarily expect their use of property may be regulated through the exercise of a State's police powers, but they do not take title subject to the possibility that their property can be "actually occupied or taken away" without just compensation. *Id*.

E

[¶34] In summary, we conclude that several parts of S.B. 2344 have been shown to be unconstitutional on their face. Specifically, we declare the following part of section 1 codified at N.D.C.C. § 38-08-25(5) to be in conflict with the state and federal takings clauses:

> Notwithstanding any other provision of law, a person conducting . . . disposal operations, or any other operation authorized by the commission under this chapter may utilize subsurface geologic formations in the state for such operations or any other permissible purpose under this chapter. Any other provision of law may not be construed to entitle the owner of a subsurface geologic formation to prohibit or demand payment for the use of the subsurface geologic formation for . . . any other operation conducted under this chapter.

[¶35] We further conclude that the newly-enacted definition of "land" in section 3 of S.B. 2344 is unconstitutional in that it defines "land" to exclude "pore space" for purposes of Chapter 38-11.1, N.D.C.C. Prior to the passage of S.B. 2344, "land" was interpreted according to its ordinary meaning. N.D.C.C. § 1-02-02. Senate Bill 2344 provided that the new statutory definition of "land" would apply in Chapter 38-11.1, and the result would be to eliminate the right to compensation for the "use of or lost value" to a surface owner's pore space. N.D.C.C. §§ 38-11.1-03(3), 38-11.1-04. Finally, we declare unconstitutional the following part of section 4 enacting § 47-31-09(1) that states: "Injection or

migration of substances into pore space for disposal operations . . . by itself, does not constitute trespass, nuisance, or other tort." These provisions, being in conflict with the higher law of the state and federal constitutions, are unenforceable.

IV

[¶36] Having concluded parts of S.B. 2344 are unconstitutional, we now must determine whether the district court erred by declaring the entirety of S.B. 2344 invalid. The State and Continental Resources argue the court erred in striking down the entirety of S.B. 2344, because the legislative findings, public interest statements, and certain other provisions can stand alone and do not constitute a taking. The district court found S.B. 2344 invalid in its entirety because "the Legislature intended the law to take effect in its entirety, based on the intertwined provisions both changing definitions and treatment under various laws, and because the challenged sections make up a large, substantive portion of the bill's entirety."

[¶37] Severability is a question of statutory and constitutional interpretation by which we seek to determine legislative intent first and foremost by reference to the ordinary meaning of the enacted text. *Kelsh v. Jaeger*, 2002 ND 53, ¶¶ 7, 20, 641 N.W.2d 100. When legislation conflicts with the constitution, the enacted text cannot be taken at face value because it is "without effect." *Home of Econ. v. Burlington N. Santa Fe R.R.*, 2005 ND 74, ¶ 5, 694 N.W.2d 840. If a statute conflicts with the constitution, the constitution, as higher law, displaces the statute to the extent of the conflict. *See generally*, Kevin C. Walsh, *Partial Unconstitutionality*, 85 N.Y.U. L. Rev. 738, 756-57 (2010). "It is a fundamental principle that a statute may be constitutional in one part and unconstitutional in another part and that if the valid part is severable from the rest, the portion which is constitutional may stand." *Kessler v. Thompson,* 75 N.W.2d 172, 189 (N.D. 1956); *State v. Strom*, 2019 ND 9, ¶ 9, 921 N.W.2d 660. But if the constitutional and the unconstitutional portions are interdependent, such that the valid portion cannot be given effect without the invalid portion, we must declare the entire law invalid. *Montana-Dakota Utilities Co. v. Johanneson*, 153 N.W.2d 414, 424 (N.D. 1967). "[W]hen legislation that is enacted to repeal, amend or otherwise modify an existing statute, is declared unconstitutional, it

is a nullity and . . . the extant statute remains operative without regard to the unsuccessful and invalid legislation." *State v. Clark*, 367 N.W.2d 168, 169 (N.D. 1985).

[¶38] We have described severability analysis as one of determining what the Legislative Assembly would have intended. *State v. Fischer*, 349 N.W.2d 16, 18 (N.D. 1984); *Arneson v. Olson,* 270 N.W.2d 125, 138 (N.D. 1978). However, our role is not to speculate as to whether there would have been a majority in each house for the bill without the unconstitutional provisions. Instead, we have explained:

> It would be inconsistent with all just principles of constitutional law to adjudge these enactments void because they are associated in the same act, but not connected with or dependent on others which are unconstitutional. Where, therefore, a part of a statute is unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject-matter, depending on each other, operating together for the same purpose, or otherwise so connected together in meaning, that it cannot be presumed the legislature would have passed the one without the other. The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand though the last fall.

*Tooz v. State*, 38 N.W.2d 285, 291–92 (N.D. 1949). An important consideration weighing severability is whether provisions of the legislation contain "matters that were not interdependent and which might appropriately have been embodied in separate legislative enactments." *Id.* at 295.

[¶39] Our review is aided by a generally applicable severability instruction the Legislative Assembly has provided. It states:

> In the event that any clause, sentence, paragraph, chapter, or other part of any title, is adjudged by any court of competent or final jurisdiction to be invalid, such judgment does not affect, impair, nor invalidate any other clause, sentence, paragraph, chapter, section, or part of such title, but is confined in its operation to the clause, sentence, paragraph, section, or part

17

thereof directly involved in the controversy in which such judgment has been rendered.

N.D.C.C. § 1-02-20; *see also* N.D. Legis. Drafting Manual, Legislative Council 8 (2021), https://ndlegis.gov/files/documents/legislativedraftingmanual.pdf (explaining that as a result of N.D.C.C. § 1-02-20, "severability clauses are not necessary in North Dakota legislation"). We have applied this section to preserve constitutional provisions of legislation when they were not dependent on the provisions we declared unconstitutional. *D.D.I., Inc. v. State ex rel. Clayburgh*, 2003 ND 32, ¶ 20 n.2, 657 N.W.2d 228; *Montana-Dakota Utilities Co.*, 153 N.W.2d at 425.

[¶40] The remaining provisions of S.B. 2344 are sufficiently distinct to operate independently from the invalid provisions. Section 1 contains amendments to N.D.C.C. § 38-08-25. Subsection 1 designates the use of carbon dioxide as acceptable for enhanced recovery of oil, gas, and other minerals in this state. While this designation of acceptable recovery processes quite reasonably could have been enacted in separate legislation, nothing in this subsection is dependent on the abrogation of pore space rights in subsection 5. Subsections 2, 3, and 4 contain legislative findings expressing that certain activities are in the public interest. Legislative findings are entirely within the Legislative Assembly's prerogative. *Cf. N.D. Legislative Assembly v. Burgum*, 2018 ND 189, ¶ 30, 916 N.W.2d 83. These findings regarding the public interest are not interdependent with any provision we have concluded is unconstitutional. Subsection 6 grants the NDIC authority to adopt and enforce rules and orders to effectuate the purposes stated in the section. On its face, this grant of administrative authority for the specified purposes does not constitute a taking, nor is it so interdependent with the invalid portions of S.B. 2344 that it cannot stand alone as a workable piece of legislation.

[¶41] Similarly, S.B. 2344 section 2 amends legislative findings in N.D.C.C. § 38-11.1-01 and provides for an interpretive limitation, neither of which is interdependent with the invalid portions of the bill. Section 3 of the bill creates new definitions of "pore space" and "surface owner," neither of which has been shown to have a facial conflict with the takings clause. Finally, section 4 enacts new subsections 2, 3, and 4 to N.D.C.C. § 47-31-09, which limit application of

certain other provisions in the context of existing contracts. Because the remaining provisions can operate independently from the provisions we declare to be unconstitutional, we conclude that the district court erred by invalidating the entirety of S.B. 2344.

V

[¶42] We now address Continental Resources' argument that the district court erred in denying the State's Rule 56(f) motion because further discovery should have been allowed to determine the value of pore space. Rule 56(f), N.D.R.Civ.P., provides that "[i]f a party opposing the [summary judgment] motion shows by declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: . . . order a continuance to enable . . . [additional] discovery to be undertaken." "Rule 56(f) is within the discretion of the district court, and the court will not be reversed unless it has abused its discretion." *Choice Fin. Grp. v. Schellpfeffer*, 2006 ND 87, ¶ 9, 712 N.W.2d 855. A court abuses its discretion if it acts in an arbitrary, unconscionable, or unreasonable manner, or if it misinterprets or misapplies the law. *Id.*

[¶43] Although Continental Resources disputed the calculated value of pore space the Association offered, further discovery was not needed because calculating the exact value of pore space was not essential to resolve the Association's facial challenge. It is undisputed that pore space has a variety of uses, including carbon dioxide storage, natural gas storage, and wastewater disposal. Relying on *Mosser v. Denbury Resources, Inc.*, 2017 ND 169, and *Mosser v. Denbury Resources, Inc.*, 112 F. Supp. 3d 906, the district court concluded as a matter of law that pore space has value. We conclude that the district court did not err in determining pore space has value as a matter of law. *Mosser*, 2017 ND 169, ¶¶ 18, 24. It was unnecessary to establish the exact value of pore space to conclude that a taking had been completed. *Loretto*, 458 U.S at 441. We conclude the district court did not abuse its discretion in denying further discovery.

# VI

[¶44] After the court granted summary judgment and requested relief in favor of the Association, it awarded attorney's fees under 42 U.S.C. §§ 1983 and 1988. The State argues the court abused its discretion by misapplying the law in awarding the Association attorney's fees because: (1) it did not expressly plead §§ 1983 and 1988 in its complaint; (2) state officials sued in their official capacity are not "persons" under § 1983; and (3) the court erred by concluding an association has standing to bring claims under § 1983 on behalf of its members.

[¶45] We begin by recognizing that North Dakota follows the American Rule for awarding attorney's fees by which successful litigants are not allowed to recover attorney's fees unless authorized by contract or statute. *Sorum*, 2020 ND 175, ¶ 58. The court found that 42 U.S.C. §§ 1983 and 1988 authorized an award of fees for the Association. Section 1983 provides individuals the right to sue government employees or those acting "under the color of state law" for civil rights violations. Section 1988 provides "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs" in an action within the scope of § 1983. Further, although § 1988 is a federal law, the Supreme Court has stated that it provides a remedy in state courts as well. *Maine v. Thiboutot*, 448 U.S. 1, 10–11 (1980) (rejecting argument that § 1988 does not apply in state courts). The Supreme Court explained that § 1988 fee awards were "an integral part of the remedies necessary to obtain compliance with § 1983," and through the Supremacy Clause "the fee provision is part of the § 1983 remedy whether the action is brought in federal or state court." *Id.* at 11 (cleaned up).

[¶46] The State first argues that the court erred in awarding fees to the Association because it failed to expressly plead §§ 1983 and 1988 in its complaint. We reject this argument. Attorney's fees may be awarded even if the complaint does not expressly plead §§ 1983 and 1988. Courts look to the substance of the underlying constitutional claim rather than to how it might be labeled in the complaint when determining whether fees are awardable under § 1988. *See Americans United for Separation of Church & State v. School Dist.,* 835 F.2d 627, 631, 633–34 (6th Cir. 1987) ("The mere failure to plead or

argue reliance on § 1983 is not fatal to a claim for attorney's fees if the pleadings and evidence do present a substantial Fourteenth Amendment claim for which § 1983 provides a remedy."); *see also Goss v. City of Little Rock*, 151 F.3d 861, 864–866 (8th Cir. 1998) (even though landowners did not plead or argue § 1983, § 1988 permitted an award of attorney's fees to the landowners for their meritorious takings action against the city); *Haley v. Pataki*, 106 F.3d 478, 481–82 (2d Cir. 1997) (holding that "it was not an abuse of discretion for the district court to permit plaintiffs to seek attorney's fees pursuant to section 1988" even though plaintiffs failed to specifically plead §§ 1983 and 1988). Therefore, although the Association did not specifically plead §§ 1983 or 1988, it raised a claim within the scope of § 1983 in its complaint by alleging a deprivation of a property right in violation of the Fifth and Fourteenth Amendments. Thus, the Association's failure to plead §§ 1983 and 1988 does not preclude an award of fees.

[¶47] Next, the State argues the attorney's fees award should be reversed because state officials sued in their official capacity are not "persons" under § 1983. The federal courts have explained that the question of who may be subject to suit under § 1983 differs from who may be required to pay fees under § 1988. Although a state or a state official acting in an official capacity is not a "person" under § 1983, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), "section 1988 does not specify with particularity those who may be called upon to shoulder its fee awards." *Charles v. Daley*, 846 F.2d 1057, 1063 (7th Cir. 1988). Section 1988 "fail[s] specifically to exempt any class of losing defendants from fee liability." *Id.* at 1064. The Supreme Court in addressing this issue has held that the Eleventh Amendment does not prohibit awards of attorney's fees under § 1988 against state officials acting in their official capacities. *Hutto v. Finney*, 437 U.S. 678, 692 (1978). In enacting § 1988, Congress "undoubtedly intended to exercise that power [] to authorize fee awards payable by the States when their officials are sued in their official capacities." *Id.* at 693–94. Section 1988 "contains no hint of an exception for States defending injunction actions." *Id.* at 694. We conclude a prevailing party can recover attorney's fees under § 1988 against a losing defendant, including the State and its officials sued in their official capacities.

[¶48] Finally, the State argues the Association lacks standing to assert its members' rights under § 1983, relying on *Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011). This argument is misplaced. All that is required under § 1988 to award fees is that a party prevailed in a claim within the scope of § 1983. Courts routinely award attorney's fees under § 1988 to associations that prevail on a civil rights claim. *See Gay Officers Action League v. Commonwealth of Puerto Rico,* 247 F.3d 288 (1st Cir. 2001); *Goss v. City of Little Rock*, 151 F.3d 861 (8th Cir. 1998); *Beaver Creek Prop. Owners Ass'n, Inc. v. Bachelor Gulch Metro. Dist.*, 271 P.3d 578 (Colo. App. 2011). Thus, because the Association prevailed on its facial challenge under the Fifth and Fourteenth Amendments, we conclude that the court did not misapply the law or otherwise abuse its discretion in awarding fees to the Association.

## VII

[¶49] The amended judgment is affirmed to the extent it declared the same provisions we identified above as unconstitutional and reversed to the extent it declared the remainder of the bill inseverable and invalid. We affirm the court's order awarding attorney's fees to the Association.

[¶50] Jon J. Jensen, C.J.
Daniel J. Crothers
Lisa Fair McEvers
Jerod E. Tufte
William A. Herauf, D.J.

[¶51] The Honorable William A. Herauf, District Judge, sitting in place of VandeWalle, J., disqualified.